# Sampson v. Cottongim.

(Decided May 16, 1933.)

(As Extended June 20, 1933.)

J. M. ROBSION and G. M. MANNING for appellant.

D. M. ALLEN and J. J. TYE for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

The right to specific performance of a contract to convey land is the decisive question presented herein. Such right is not an absolute one, but rests entirely on judicial discretion, to be exercised according to settled principles of equity and not arbitrarily, yet always according to the facts of the particular case.

"An application for specific performance is an appeal to the sound discretion of the court and one of the principles which controls the exercise of this discretion is that specific performance of a contract will not be decreed where its enforcement will be inequitable under the particular facts as they exist. This is in accordance with the general doctrine of equity, that when a party comes into a court of chancery seeking equity, he must have clean hands and is bound to do justice and not ask the court to become an instrument of inequity. Therefore, before relief will be granted it must appear that good conscience and substantial justice require it. * * * A party is not permitted to sleep over his rights to the prejudice of the party on whom he makes a claim, and who by the delay may be deprived of the evidence and means of effectually defending himself. Therefore the demand must be made within a reasonable time; otherwise the claim is considered stale and a court of equity which is never active in relief against conscience or public convenience has always refused its aid to stale demands when a party has slept on his rights and acquiesced for a great length of time. Nothing can call forth into activity a court of equity but conscience, good faith and reasonable diligence. When these are wanting the court is passive and does nothing." 10 R. C. L. p. 388; Glenn v. Lowther, 219 Ky. 383, 293 S. W. 947.

With these principles in mind, we shall now review the facts without considering the objections to the pleadings. In 1906, 1907, or 1908, Flem D. Sampson, R. O. Campbell, and Dr. Bennett entered into a written contract whereby it was agreed that Flem D. Sampson would purchase in his name and accept deeds to mineral rights in land situated in Clay county, Ky. To do this, John Sampson was engaged by them to go into Clay county and purchase mineral rights, and accept deeds

in the name of Flem D. Sampson, at the price per acre which they authorized and directed. He did this, and accepted deeds for a large acreage. To acquire one particular tract known as the Sherman Smith land, he was required to, and purchased, the fee, in order to get the mineral rights therein, at the price of $4 per acre, and the deed to it was taken in the name of Flem D. Sampson. The deeds to the mineral rights, including the Sherman Smith land, were recorded in the county court clerk's office of Clay county, the county in which the land was situated. Campbell and Bennett paid their portion of the purchase price, and the wages of John Sampson and his helpers, including their expenses, and Flem D. Sampson paid his portion thereof. The deeds thus acquired were recorded not later than 1908, and, when the acreage they desired was procured, Flem D. Sampson, Campbell, and Bennett terminated their connection with John Sampson. Thereafter, on the 15th day of June 1910, John Sampson and Jacob Howard entered into a written contract in which John Sampson agreed to buy, and furnish to Howard, 4,000 acres of mineral rights in and under land on Collins fork of Goose creek in Knox and Clay counties, within a boundary agreed on by Howard and Matt H. Beddo. John Sampson agreed to furnish deeds, with covenant of general warranty, to Howard for 1,000 acres, and like deeds to Matt H. Beddo for 3,000 acres. Howard agreed to pay John Sampson $5 per acre therefor to the amount of $5,000. It was also stipulated in the writing that Howard and John Sampson were to obtain options on adjoining tracts in both their names, one-half to belong to each of them. In pursuance to this contract, during the year 1910, John Sampson went into Clay county and began to carry it out. He acquired deeds to the mineral rights on a large number of tracts in the vicinity of the land owned by John L. Cottongim. John Sampson endeavored to purchase and accept deeds to the tracts so they would constitute a block of 1,000 acres. While so engaged, some time during the year 1910, he went in company with White and Frank Smith, a deputy county clerk, to the home of John L. Cottongim, John Sampson claims, for the purpose of procuring an option on Cottongim's mineral rights on his home tract. From this point the story of John L. Cottongim begins, and the divergence of his, and the Sampsons', asseverations furnishes the issues to be determined.

To establish his cause of action, John L. Cottongim appeared as a witness on three occasions, viz., on May 18, 1931, July 25, 1931, and December 18, 1931. It is appropriate to observe that Cottongim admits that, after the date fixed by him, Smith, and White as the date John Sampson entered into a writing with him, at his home, he entered into a written contract with G. W. Smith by which he agreed to sell to Smith "all of the mineral of every character and kind, class, order, genera, species, sub-species and variety," in and under the tract of land, concerning which he now asserts he and John Sampson executed and delivered the writing, upon which he bases his cause of action. In one deposition he claims the transaction between him and John Sampson occurred about the year 1913 or 1914; in another, that it happened in 1911, 1912, or 1913. To make accuracy assured, we here adopt a portion of Cottongim's deposition, taken as upon cross-examination:

"Q. Didn't John Sampson give you a writing for himself or Flem D. Sampson, agreeing to convey to you the Sherman Smith tract of land? A. He never gave me any writing, but he was to come back the next week and make deeds, he claimed that he did not have time that evening.

"Q. Now you gave John Sampson a writing whereby you agreed to convey your land or the minerals in it, except the oil or gas rights. Why didn't you require a writing from John Sampson requiring him or his brother, the defendant, F. D. Sampson to convey the Sherman Smith tract to you? A. He stated he would be back the next week and have the land surveyed, and he would make deeds, that he did not have time to give me a writing that evening, and that he would send the surveyor the next week and run out my land, but John was not there. * * *

"Q. Why didn't you require John Sampson to give you a bond and agree for Flem D. Sampson in that to convey the Sherman Smith surface and oil and gas to you? A. Well, I will tell you, he said he would be back the next week and would have our land run out and make deeds.

"Q. So you took John Sampson's word for it, didn't you? A. That much of it.

"Q. When he said he wouldn't have time, or something like that, and would be back next week and run it out and make deeds, I guess you thought it would be all right not to have any bond from him for the Sherman Smith land? A. I knew that I needed it, but he claimed to be in such a hurry, he talked me out of it. John had already got mine.

"Q. John according to your statement had already gotten your bond or the bond of yourself or wife, and then he got in too big a hurry to make you a bond for the Smith tract. Is that correct? A. That is correct."

The original deposition in which these questions and answers appear was lost or mislaid, or it was thought by Cottongim to be lost. He therefore applied to the court for leave to retake it. Omitting the questions, on its second taking, we reproduce the answers: "Some few weeks after that (i. e., the conversation with Flem D. Sampson), but I don't think exceeding one month, John Sampson, brother of the defendant, came to my home and stated he wanted my coal, that he needed it to make up the boundary block; that they wanted to exchange the surface, and the oil and gas in the Sherman Smith farm which was on White's Branch, about two miles from my place, for my coal and minerals under my farm, excepting the oil and gas, and that they were willing to exchange it, acre for acre." John Sampson wrote out the title bond for the coal and other minerals under the tract of land described in the petition as the Cottongim tract, to the defendant, Flem D. Sampson. "Me and my wife signed the bond and to the best of my recollection, John Sampson signed it as the agent of Flem D. Sampson, the defendant, and we all signed this and acknowledged it before Frank Smith, who was then a deputy county clerk of Clay county." "John Sampson took it off. Something was said about a copy for me, and he said that he did not have time then; that he was in a hurry but that he would be back the next week, bring a surveyor, run it out and make deeds." "I think it was the next week, they sent Mr. William Parker, a surveyor of Knox County, to run my land, and he did that and figured up the acres, but John nor the defendant did not come. A little later on John came down and gave me a writing directing me to take possession of what was known as the Sherman Smith

farm, the farm I was to have the surface, the timber, the oil and the gas as set out in the title bond for all my minerals, except the oil and gas." "To the best of my recollection it was about 1913 or 1914." "I asked him for the deed the first time he came back after he got the title bond, and he gave me written notice to take possession of the Sherman Smith farm, which is the same as the Sampson tract described in the petition, and John stated that 'Flem was away, or that he could not get hold of him to make the deed, but that he would get with him and fix it up in the next day or two.' * * * I am, and have had it (possession) for about 17 or 18 years." "I have made the deed to the minerals and land according to the terms of the title bond, and offered it to the defendant, but he refused to take it, and of course I wanted him to give me my deed for the property I was getting in exchange for what I was letting him have." "He (John Sampson) had bought for the defendant, Flem D. Sampson practically all of the mineral in the territory where my property was located." "Not only mine, but all the rest he was buying in that territory he was buying for Flem." "One day I was in Barbourville where he (Flem D. Sampson) was holding circuit court, and I met him in the courtyard and asked him to make me a deed to the property he was to exchange to me for my coal, and he said that John was out of town and just as soon as he could get hold of him, he would fix it up and deliver me the deed." "Morgan Culton a surveyor of Manchester came alone there a long time after Parker surveyed it and told me he wanted to survey my land." "Later on Culton told me he surveyed it for Flem Sampson, and that Sampson paid him for it."

To corroborate the foregoing, Cottongim introduced John C. White. Omitting the questions, we give his answers: "He (John Sampson) said, 'I want you to help me make a deal with Mr. Cottongim, swapping the surface that Flem owns on White's branch for Mr. Cottongim's mineral rights,' and I asked him how he wanted to trade, and he said, 'acre for acre.' That he would give him an acre of surface rights of Flem's for an acre of Cottongim's land, or maybe he said minerals." "We went on to Mr. Cottongim's and John Sampson told him what he wanted or proposed to do, that he wanted to swap him an acre of the surface of the Sherman Smith farm for an acre of mineral under

Mr. Cottongim's land, and that he was willing to have it run out and treated just that way, acre for acre, and John wrote out a contract or title bond, and the way I understood it, it was between Mr. Cottongim and his wife, and Flem D. Sampson, as I knew Flem owned the surface that he was trading, and they asked me to, and I witnessed the contract." "I think Mr. Sampson took the contract himself." "He told Mr. Cottongim that he would send a surveyor right away and have it surveyed, and they could make deeds."

For a like purpose the deposition of Frank Smith was taken. This witness testified that he had helped get mineral rights for Flem D. Sampson in Clay county, including a tract of his uncle, Sam Riley. The contract price per acre was $1. John Sampson came to the witness, and wanted him to go and take acknowledgments to the deeds for mineral rights, and agreed to pay, and paid, him $5 per day. He testified that John Sampson told him that Flem was furnishing the money; that all the deeds for mineral rights that he helped obtain were made to Flem Sampson. Deeds of George Cole, Jack Collins, James Smith, Millard Chadwell, Tom Hibbard, and others were taken in the name of Flem D. Sampson, conveying to him the mineral rights. A deed to the fee in the Sherman Smith tract was taken in the name of Flem D. Sampson at the price of $4 per acre. These statements of this witness refer to the work in 1906, 1907, and 1908, when John Sampson was procuring deeds to mineral rights for Campbell, Bennett, and Flem D. Sampson. Cottongim presents this evidence of John Sampson's work, or services, while procuring the deeds for them, as evidence of the agencyship of John Sampson at the time it is claimed by him (Cottongim) that he was acting as agent of Flem D. Sampson, when they, as he asserts, entered into the alleged writing involved herein. The fact that John Sampson acted as agent for Flem Sampson in 1906, 1907, or 1908 might create a presumptoin that he was so acting in 1910, but the explanation that during the years 1906, 1907, or 1908 he was acting as agent for Campbell, Bennett, and Flem D. Sampson is sufficient to overcome such presumption. Especially so when the writing existing between John Sampson and Howard shows the capacity in which, and for whom, he was acting in 1910, and thereafter.

The witness Frank Smith made this answer:

"My understanding was their trade (between Mr. Cottongim and John Sampson at the time it is claimed by Cottongim the bond was executed) was that John L. Cottongim was to give him an acre of his mineral, that is acre for acre, reserving the oil and gas, for an acre of his surface land, and John L. Cottongim was to get the oil and gas under the land that he was getting the surface from Sampson. Both parties agreed on those terms and conditions, and John Sampson drew up the title bond. It was acknowledged by Cottongim and wife before me as deputy clerk. John C. White and William Cottongim witnessed the signature of John L. Cottongim and his wife." He was also asked:

"You took the acknowledgment to the title bond, to whom did the title bond make grantee? A. I am not in a position to state that, but it was my understanding that all of it was going to Flem D. Sampson, but to state exactly the date or the name of the grantee, I cannot, because it was my understanding that everything was made to Flem D. Sampson, the best I remember it was made to him. * * *

"Q. State whether or not you ever heard John W. Sampson make any statement as to whether or not he desired or wanted the Cottongim tract of land to complete his block of mineral? A. I did."

Flem D. Sampson and John Sampson unequivocally deny that Flem D. Sampson had any connection with, or interest in, the transaction between John Sampson and John L. Cottongim. They likewise declare that John Sampson was not acting for Flem D. Sampson at that time, nor since the relations between him and Bennett, Campbell, and Flem D. Sampson terminated in 1906, 1907, or 1908. The written contract between John Sampson and Howard corroborates their statements.

John Sampson asserts that the writing signed by Cottongim and wife, and acknowledged by them before Frank Smith, was an option, accepted by him while carrying out his contract with Howard; that the option was procured and accepted by him with the statement to Cottongim that it was desired to enable him to acquire a block of 1,000 acres. Cottongim and Frank

Smith admit that he informed Cottongim that he was endeavoring to secure a block of 1,000 acres, including Cottongim's land.

A close scrutiny of the testimony of Cottongim, White, and Frank Smith discloses that no writing was signed by John Sampson either as agent or otherwise, concerning the Sherman Smith tract of land, except the second deposition of Cottongim. His second deposition, when considered in the light of the circumstances, is convincing proof that its taking was a clever invention to circumvent the statutes of frauds. Having testified in his first deposition affirmatively that no writing was signed by John Sampson, either as agent or otherwise, at the time he was at his home, accompanied by White and Frank Smith, we are persuaded that his narration of the transaction as therein given is the correct one, and that his second deposition wherein he testified the contrary should be disregarded.

Cottongim justifies his taking possession of, and authorizing the cutting of the timber on, the Sherman Smith land and receiving the proceeds therefor, by claiming that, within a short time after the writing was executed and delivered in the presence of White and Frank Smith, John Sampson returned to his home and delivered to him another writing authorizing him to take possession of the land. He fails to produce this writing, and declares it was lost. There not being at that time a binding and enforceable contract signed by Flem D. Sampson or his agent, even if John Sampson delivered to him a writing authorizing him to take possession of the land, its delivery did not dispense with the necessity of a contract in writing, signed by the grantor or his agent, evidencing the sale and agreement to convey by the grantor.

A specific performance will not be granted on proof of an oral contract of a sale of land. To entitle the vendee to compel specific performance by the vendor, it is an indispensable requirement that a writing evidencing the contract be signed by the vendor and delivered to the vendee. Klatch v. Simpson, 237 Ky. 84, 34 S. W. (2d) 951; Justice v. Justice, 239 Ky. 155, 39 S. W. (2d) 250.

Where parties agree to exchange land, or minerals in place, both must sign a written memorandum of the

agreement in order to satisfy the statute of frauds (Ky. Stats. sec. 470), and to entitle either to a specific performance. Green v. Elliott County Board of Education, 244 Ky. 500, 51 S. W. (2d) 459. The burden of proof is on the vendee to establish the signing and delivery of the contract by the vendor. Preece v. Wolford, 196 Ky. 710, 246 S. W. 27.

Flem D. Sampson was not in Clay county except as a candidate for district office. He had no agent residing in the county. He had no knowledge, or opportunity of gaining knowledge, of the claim of Cottongim that he had a contract with John Sampson as agent, for the Sherman Smith tract; nor of Cottongim's taking possession of the land and the sale of the timber thereon by him. While Flem D. Sampson was a candidate, Cottongim endeavored to alarm, intimidate, and coerce him to convey to him the Sherman Smith tract by threatening to oppose, actively, his candidacy, and by causing others so to do, and to convey him knowledge thereof. Cottongim and his friends asserted that he (Cottongim) was a man of "parts" and general understanding in the neighborhood, a power in local politics, and vigorously declared, with the help of his friends, he would defeat Sampson at the election, unless he deeded him the Sherman Smith land. Sampson was uninfluenced by such threatened activities, and refused to make the deed. Not to be thwarted nor defeated, while Sampson was in the county as a candidate, he filed this action, and caused summons to be served on him in the presence of a large crowd. He charged in his pleadings that Sampson had executed and delivered to him a writing evidencing the sale, and thereafter had sold and conveyed to Howard, and received payment for, the mineral under the Cottongim land, but still refused to carry out his contract. If not reprehensible, the conduct of Cottongim was not required nor necessary, if in fact at that time the writing existed or had been theretofore signed by Flem D. Sampson or his agent, binding Flem D. Sampson to convey to him the Sherman Smith land.

J. M. Culton testified that Flem D. Sampson employed him to survey, and he surveyed for him, the Cottongim land; Sampson informing him at the time he had purchased the minerals thereunder. Flem D. Sampson positively denies that he employed or paid Culton for such purpose. However, accepting Culton's state-

ments as correct, such employment and payment cannot supply the imperative requirement, in such case, of a writing signed by the vendor, as required by the statute of frauds.

No evidence of agency of John Sampson is presented other than his oral declaration. The relation of agencyship cannot be established by the declarations of the agent. J. J. Newberry Co. v. Faulconer, 248 Ky. 59, 58 S. W. (2d) 217, and cases cited.

It is a uniform rule of practice in this court to give great weight to the judgment of the chancellor, where the evidence is conflicting, or, on reviewing it, the mind is left in doubt. Reviewing and considering the evidence for ourselves, we are convinced that Cottongim is precluded by the lack of evidence, showing a contract ever existed, either oral or written, by the principles of equity, reiterated in the beginning of this opinion, and by the statutes of frauds and perjuries.

The defendant set up a counterclaim in the second paragraph of his answer for rents and timber removed from the land described in the petition. The court sustained a demurrer to this paragraph. This was proper inasmuch as the counterclaim asserted did not grow out of and proceed from the cause of action stated in the petition. Civil Code of Practice, sec. 96, subsec. 1; Duff v. Wilking, 203 Ky. 817, 263 S. W. 373.

With this view, the judgment is reversed, with directions to dismiss the petition and for proceedings consistent with this opinion.